[Cite as *Hunter v. Hunter*, 2023-Ohio-3331.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

CARL HUNTER,

Plaintiff-Appellant,

v.

JACQUELINE HUNTER,

Defendant-Appellee,

and

KAREN HUNTER,

Intervenor-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 22 CO 0028, 22 CO 0029**

---

Civil Appeal from the
Court of Common Pleas, Domestic Relations Division, of Columbiana County, Ohio
Case No. 2014-DR-252

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed, Vacated and Remanded.

---

*Atty. Kathleen Bartlett,* 542 B East State Street, Salem, Ohio 44460, for Plaintiff-Appellant and

*Atty. Brian J. Macala,* 117 South Lincoln Avenue, Salem, Ohio 44460, for Defendant-Appellee and

*Atty. C. Brooke Zellers,* 166 North Union Avenue, Salem, Ohio 44460, for Intervenor-Appellant.

Dated:  September 15, 2023

_____

**D'APOLITO, P.J.**

**{¶1}**  Intervenor-Appellant,  Karen  Hunter,  paternal  grandmother ("Grandmother"), and Plaintiff-Appellant, Carl Hunter ("Father"), appeal the judgment entry of the Domestic Relations Division of Columbiana County Court of Common Pleas sustaining the third motion for reallocation of parental rights filed by Defendant-Appellee, Jacqueline Hunter ("Mother") with respect to B.H. (D.O.B. 09/23/2010) and S.H. (D.O.B. 02/05/2013) [1].  This matter is before us for a second time.

**{¶2}**  In the first appeal, the matter was remanded for rehearing due to the domestic relations court's failure to serve the third motion to reallocate and to provide notice of the hearing on the motion to Grandmother. Grandmother was the designated residential parent due to the parents' unsuitability at the time of the divorce, and as a consequence, a party to be served in this case.  *C.H. v. J.H.*, 7th Dist. Columbiana No. 19 CO 0034, 2020-Ohio-4733.

**{¶3}**  Grandmother advances three assignments of error.  First, Grandmother argues that the domestic relations court misapplied the law as it relates to R.C. 3109.04(E)(1)(a), that is, the domestic relations court erred when it held that both parents must be deemed unsuitable before the domestic relations court could consider awarding custody of the children to a non-parent.  Next, Grandmother contends that the domestic relations court's decision is against the manifest weight of the evidence. Finally, Grandmother asserts that the domestic relations court abused its discretion when it failed to consider all of the evidence and construed evidence unfairly in favor of Mother.

_____

[1] Grandmother's appeal was assigned case no. 22 CO 0028 and Father's appeal was assigned case no. 22 CO 0029.  This Court consolidated the cases on January 19, 2023.

**{¶4}** Father advances two assignments of error. First, Father argues that the domestic relations court disregarded the law of the case when it considered testimony offered at the 2019 hearing on the third motion to reallocate, despite the fact that Grandmother was not present at the hearing. Second, Father argues that the domestic relations court abused its discretion when it relied on conclusions reached in the 2019 Magistrate's Decision to determine that a change of circumstances had occurred, as the 2019 Decision was vacated as a result of the first appeal.

**{¶5}** Because the domestic relations court predicated reallocation on Grandmother's failure to demonstrate Mother's unsuitability, rather than solely on the change of circumstances/best interest of the child test set forth in R.C. 3109.04(E)(1)(a), the judgment entry of the domestic relations court is reversed and vacated. This matter is remanded to the domestic relations court for a de novo hearing on the third motion to reallocate, where the trial court shall not consider any testimony or evidence offered at any prior hearing.

## FACTS AND PROCEDURAL HISTORY

**{¶6}** During the divorce proceedings filed in 2014, neither Father nor Mother were found to be a suitable residential parent. Father regularly abused alcohol and had two OVI convictions, as well as compromised cognitive abilities due to a head injury. Mother had baselessly accused Father of physical and sexual abuse, as well as pedophilia. Mother had engaged in a campaign to convince the children that Father had sexually abused them without any physical evidence supporting her claims. In addition, and contrary to medical advice, Mother continued to breast-feed the children, who were ages five and two-and-a-half when the divorce decree was issued. The Guardian Ad Litem ("GAL") reported that Mother used breast-feeding as an "incentive/disciplinary tool," and that the children required extensive dental surgery as a result of "milk rot."

**{¶7}** Grandmother filed her first motion to intervene after the GAL requested the immediate removal of the children from Mother on the ground of parental alienation. At the time, Grandmother was a registered nurse with twenty-five years of experience. She worked a steady day shift and was in good physical health. Based on the recommendation

Case Nos. 22 CO 0028, 22 CO 0029

of the GAL, the domestic relations court awarded primary custody of the children to Grandmother in the divorce decree in September of 2015.

{¶8} Mother filed three motions to reallocate parental rights in the following three years. Her first motion, which was filed two months after Grandmother was awarded custody, was resolved by an agreement between the parties that Father would become the residential parent and legal custodian. Father and the children were living with the paternal grandparents at the time.

{¶9} Mother's second motion, filed less than a year after the agreed order, asserted that Father acted with an "air of superiority" because of his primary custody designation and acted as though Mother had no rights. The domestic relations court overruled Mother's second motion finding that no change in circumstances had occurred.

{¶10} In the judgment entry overruling the second motion, the domestic relations court observed that Father had married his second wife in the interim between the first and second motions to reallocate. The domestic relations court further observed that her presence, as well as the presence of her two children, was a positive influence on Father and the children.

{¶11} However, within four days of the issuance of the judgment entry overruling Mother's second motion to reallocate parental rights, Father's second wife filed for divorce and for a domestic relations civil protection order ("DVCPO") against Father. Mother filed the third motion to reallocate parental rights roughly four months later. Grandmother was not served with the third motion to reallocate and she did not receive notice of the hearing on the motion.

{¶12} At the hearing, Father's then second ex-wife, A.H., testified that she had mislead the domestic relations court regarding Father's behavior at the previous hearing due to pressure exerted by Father and his family. She further testified that Father and his family had convinced her that the situation with Mother was much worse than the situation with Father.

{¶13} According to her testimony, Father was prone to excessive drinking and violent outbursts. He was drunk at least two times per week. Specifically, she described three instances where Father was drunk and confrontational with her and the children. On one occasion, he brandished an unloaded shotgun and threatened to kill himself. On

Case Nos. 22 CO 0028, 22 CO 0029

another occasion, he tried to force himself on her sexually while pretending to be someone who molested her as a child. On the third occasion, her 13-year-old son intervened in an argument between the couple and Father "put [her son] on the ground, and started punching [him]." (4/3/19 Hrg Tr., 38.) She testified that Father is "fine when [he is] not drinking. [He is] very angry when he is." (*Id.* at p. 37.)

{¶14} Father denied all of the allegations in the DVCPO petition, despite the fact that he entered into a consent temporary protection order. When asked the reason he entered into the consent order, he explained that "[they] were going through a divorce" and "[he did not] need to be around her." (*Id.* at p. 19.)

{¶15} Father likewise denied consuming alcohol in excess. He testified he imbibed once a month. He also denied having a problem controlling his anger.

{¶16} Mother testified the children were afraid of Father and cried when they had to return to his custody. She further testified that the children had related the story to her about the unloaded shotgun.

{¶17} Mother observed that Father had moved four times without notifying her, and he did not advise her of the children's medical appointments or school pageants. Midway through Mother's testimony, Father began to interject comments, and at the behest of his counsel, Father voluntarily left the courtroom.

{¶18} Mother testified that she would be particularly attentive to facilitating visitation and timely providing information about the children to Father if she was the residential parent, because that sort of cooperation had been withheld from her by Father. She testified, "even know [sic] he was so nasty to me, [I am] going to try to be civil, which I have been since the whole time with him so we can parent these children the best we can." (4/3/19 Hrg., p.78.)

{¶19} When asked why she should be the residential parent, she responded:

Because [I am] their mom. And they obviously want to stay with me. They cry every time I have to take them back. I can make sure they get to school. And they get to the doctor.

[I am] not going to be abusive or – I [do not] have a drinking problem.

(*Id.* at p. 74.)

Case Nos. 22 CO 0028, 22 CO 0029

**{¶20}** The Magistrate sustained Mother's third motion to reallocate parental rights. He found a change of circumstances had occurred due to Father's consent to the DVCPO. In the best interest analysis, he cited Father's denial of his alcohol abuse, and his repeated failure to notify the court of his relocation with the children. The Magistrate observed that Mother had "brought stability to her life," while Father had "blown it with his drinking and anger." (5/14/19 Mag. Decision., p. 4.) The domestic relations court agreed. At the end of the 2019 school year, Mother was named primary residential parent and Father was awarded reasonable parenting time in accordance with Local Rule 9.4.

**{¶21}** Grandmother's second motion to intervene was filed exactly three months after the hearing on August 14, 2019. The motion's caption is a misnomer. Grandmother's request to intervene was secondary to her argument that the Magistrate's decision should be vacated because she was not served with notice of the hearing, despite the fact that she was a party to the divorce action. Further, Grandmother asserted that it was in the best interest of the children to be returned to her custody.

**{¶22}** When the second motion to intervene was filed, the domestic relations court had already adopted the Magistrate's decision, but objections to the Magistrate's decision were pending. A non-oral hearing that had been scheduled for August 16, 2019 was continued to October 25, 2019, to allow additional time for the preparation of the hearing transcript.

**{¶23}** On August 27, 2019, the domestic relations court overruled Grandmother's motion to intervene finding that it was untimely, as the evidentiary hearing on the motion to reallocate parental rights had been held on April 3, 2019, and the Magistrate had issued his decision granting the motion and awarding custody to Mother on May 14, 2019.

**{¶24}** Grandmother filed a timely appeal. The domestic relations court withheld consideration of the objections due to the pending appeal. On September 24, 2020, we vacated the judgment entry reallocating parental rights to Mother based on the domestic relations court's failure to provide a copy of the third motion to reallocate and notice of the hearing to Grandmother, a party defendant when the third motion was filed.

**{¶25}** Following remand, the Magistrate issued a temporary order pending rehearing and resolution of the third motion to reallocate parental rights, in which he named Father the primary residential parent. Mother was allowed week-on, week-off

parenting time. The children were ordered to continue attending an online schooling program through the Weirton school district.

**{¶26}** Further, the Magistrate sustained Grandmother's motion to reappoint the GAL. Two post-remand GAL reports are in the record, a final report that is undated and a supplemental report dated June 3, 2021. The final report reflects that the GAL met with the parties to this case in 2020, and with the children in 2021.

**{¶27}** On June 2 and 10, 2021, the Magistrate conducted a hearing on the third motion to reallocate at which Grandmother, Mother, and the GAL offered testimony. The Magistrate also considered the testimony and evidence offered at the April 3, 2019 hearing, from which Grandmother was excluded.

**{¶28}** Grandmother maintained a daily journal documenting the roughly seven years following the petition for divorce. Grandmother conceded that Father was unsuitable as a residential parent due to his alcohol abuse and violent outbursts, despite testimony that his anger has never been directed at his own children. Father underwent a full biological/psychiatric/social assessment on March 26, 2021. The social worker concluded that Father had no mental health or substance abuse concerns that required therapeutic services.

**{¶29}** Grandmother testified that she is "the party best able to care for the [children] and give them a constant stable environment," and that she would "relieve the parents of the stress of parenting." Grandmother further testified that she should be given custody of the children to spare them from the emotionally-draining battles the children witness on a regular basis whenever the parents interact. The GAL observed that the parents hate each other more than they love their children.

**{¶30}** Grandmother testified that Mother and Father engage in expletive-filled arguments in front of the children. Father's preferred pejorative for Mother is "cunt." The weekly drop-offs/pick-ups are particularly explosive. Grandmother testified that the children are "uptight" during the exchanges.

**{¶31}** According to the GAL, B.H. reported that during an exchange in January 2021, Mother called Father a "cocksucker" and ran over his foot with her automobile. The GAL did not investigate B.H.'s allegations and conceded that no criminal charges resulted from the alleged confrontation.

**{¶32}** Nonetheless, the GAL was particularly troubled by Mother's choice of the pejorative, as he considered it a thinly-veiled continuation of her effort to cast Father as a pedophile. In addition to accusing Father of molesting the children, Mother has also accused the paternal grandfather of molesting Father, and expressed her concern for the children when they are unsupervised with the paternal grandfather.

**{¶33}** At the 2021 hearing, Mother denied having accused Father of molesting the children. The GAL expressed shock and disbelief at her testimony, as her accusations were ultimately recognized by the domestic relations court as unsubstantiated, but nonetheless resulted in the cessation of Father's visitation rights for six months.

**{¶34}** According to the final GAL report, Mother engaged in protracted litigation against Father, which included accusing Father of anally-penetrating B.H. with a screwdriver. It was further revealed that she rewarded B.H. (then age 5) with breastfeeding for repeating lies regarding the alleged abuse. At the hearing, the GAL suggested that Mother's purported inability to recall her accusations might be evidence of mental illness, which he concludes in his supplemental report (filed between the June 2nd and 10th hearings) is evidence of her unsuitability to be the residential parent.

**{¶35}** However, Mother's counsel argued that the accusations occurred seven years ago, and perhaps Mother "wants to put it out of her mind." (6/2/21 and 6/10/21 Hrg. Tr., p. 313.) He asked the GAL, "Could it not be that seven years later [she has] put it behind her?" (*Id.* at p. 314.)

**{¶36}** Grandmother testified that Mother has never abandoned her campaign to alienate Father from the children. There were occasions when the children did not speak to Father the entire car ride following an exchange. Both parents, according to Grandmother, discuss legal issues in front of the children, although Grandmother claimed that Father's conduct is unintentional.

**{¶37}** On one occasion, S.H. asked Mother whether ear piercing was painful. Mother had S.H.'s ears pierced without Father's approval. Grandmother contended Mother sent S.H. to Father's house hoping to raise Father's ire and aim it squarely at S.H.

**{¶38}** Grandmother further testified that Mother uses the children as a "go-between" with Father with respect to various legal issues. Grandmother asserted that Mother misleads the children regarding the financial disparity between Mother and Father.

For instance, B.H. expressed concern over Mother's financial situation, telling Grandmother that he helps Mother makes wreaths to supplement her income. Mother testified that she does not sell the wreaths, but instead, gives them away.

**{¶39}** According to Grandmother, Mother seizes every opportunity to interfere with Father's time with the children. In November of 2020, despite the fact that B.H. did not have a fever, Mother insisted that both children be tested for COVID-19 by the school physician's assistant. Mother informed Father that the children were quarantined and could not leave her home. The school physician's assistant contacted the GAL to say visitation was not impacted by the quarantine. Mother claimed that she misunderstood the instructions. Further, when Mother was asked if B.H. was permitted to play with a friend from the neighborhood during his quarantine, she testified he was not, but B.H. and his friends are "kids" and kids do not listen.

**{¶40}** Grandmother testified the children did not complete any of their online school work during Mother's alternating weeks. As a consequence, the children were required to complete two weeks of school work during Father's week. Grandmother testified that the children associated Father's weeks with a voluminous amount of school work and assigned chores and Mother's weeks with fun.

**{¶41}** The assistant principal visited Mother's residence at the end of the first semester of online schooling, after numerous telephone messages to Mother went unanswered. During the home visit, the assistant principal explained the children would not advance from their respective grades if their schoolwork was not completed. The principal described Mother as disinterested in the children's education, however, the principal complimented Father's involvement and assistance with homework.

**{¶42}** Mother claimed that online school was Father's idea and the decision was undertaken late in the year, which resulted in an almost insurmountable amount of work. When Mother was asked why she did not respond to the school's telephone messages, she said that the school called her at work and she was unable to leave "a million dollars sit[ting] in [her] station" to step away and conduct a personal telephone call.[2]

---

[2] Mother is a vault teller at Loomis Armored Incorporated.

Case Nos. 22 CO 0028, 22 CO 0029

**{¶43}** Grandmother testified that B.H. broke his collarbone and Mother did not inform Father. B.H. appeared for visitation with his arm in a sling and told Father that he should be administered Tylenol.

**{¶44}** Mother testified that she may have forgotten her mobile phone in her rush to get B.H. to the hospital, but she called Father immediately when they returned home. Mother further testified that B.H. was no longer taking Tylenol when he was returned to Father's custody and B.H. was no longer wearing the sling for therapeutic purposes, but instead, as a sort of toy. Accordingly, Mother had no obligation to inform Father about any required treatment.

**{¶45}** According to the GAL, both children indicated their desire to live with Mother because "she is more fun and lets them do more." Both children also expressed their desire not to live with their paternal grandparents. B.H. began crying during the interview and the GAL had to engage B.H. in a breathing exercise to calm him. The children reported that Grandmother and Father are "mean."

**{¶46}** The GAL believed the children had been coached by Mother, because they raised the issue of their preferred residence twice without prompting during a half-hour interview. He attributed the observation that Grandmother and Father are mean to the fact that they are the disciplinarians with respect to schoolwork and chores.

**{¶47}** Grandmother testified that she was awakened by B.H., who was in tears, roughly three months after the first interview with the GAL. B.H. explained that he feared for Father's life because of the danger associated with mining. B.H. also asked Grandmother if he could meet with the GAL a second time, where he explained that he did not want to choose between his parents, because he did not want either parent to be angry about his choice. B.H., who had attended three different schools in three years, reported his greatest concern was having to attend a different school.

**{¶48}** The GAL ultimately opined that Mother's continuing efforts to alienate the children from their father made her unsuitable to be the residential parent. According to his report, the GAL believes Mother will continue to bait Father in hopes that he will commit an egregious act that will foreclose him from participation in the children's lives. He further opined Grandmother should be given custody as she provided both a conflict-

free and loving home, where the children's emotional, medical, and educational needs were the first priority.

{¶49} In an effort to dispel the accusations of alienation by Mother, her counsel asked the GAL, "[t]hey have a good relationship with [Father] * * *so where is the alienation?" The GAL responded:

> Wait. I never state in the report that they have a good relationship with him. I state they love him and I describe for everyone what they do with him. * * * I think the – the way he interacts with [Mother] is so awful that it terribly affects the children.

(*Id.* at 280.)

{¶50} Mother's counsel asked the GAL if Father is responsible for his relationship with his children. The GAL replied, "[n]o. I think [it is] mutual because these two argue over everything." The GAL testified that Father never told him that Mother "knows how to push his buttons," but it is evident Mother intentionally provokes Father's behavior. The GAL asserted that Father's outbursts, as well as his suicidal ideation, could be directly linked to Mother's repeated efforts to win custody of the children.

{¶51} Mother conceded that the children spend twelve hours a day in day care during the summer. Her place of employment is one hour away from the daycare center. Grandmother, on the other hand, was able to provide around-the-clock care for the children. Mother argued that Father would have full access to the children if they lived with Grandmother, whereas Mother's access would be limited to visitation in Mother's home.

{¶52} Grandmother asserted that Mother chose the day care program because it provided her greater control than other centers. Grandmother testified that Mother would not allow the daycare center to release the children to Father when he would arrive early to retrieve them. He is forced to sit and wait until the appointed release time.

{¶53} On one occasion, Father engaged in a shouting match with a daycare employee who refused to allow the children to leave. At some point during the

confrontation, he removed his shirt, which the employee interpreted as a prelude to a physical altercation.

{¶54} Father explained that he never wears a shirt in the summertime. The GAL observed that the excuse might be valid based on Father's habit of "tell[ing] on himself." (6/3/21 Supplemental GAL Report, p. 1.) At the hearing, the GAL opined that Father might just be one of those guys who walks around shirtless all summer.

{¶55} Grandmother offered a proposed 9-A Uniform Local Companionship Schedule into evidence at the 2021 hearings, which set forth a proposed visitation schedule for the parents, should Grandmother be designated as the residential parent. Parents would have weekend visitation every third week, with no weekday visitation. Grandmother reasoned that the children should spend every third weekend at Grandmother's residence to have an opportunity to rest and recharge. Mother argued that the schedule would essentially grant Father two weeks with the children, as he was welcome in Grandmother's home at any time and Mother was not.

{¶56} In the GAL's supplemental report, he recommends Father in favor of Mother as an alternative to Grandmother, because Father has not been physically abusive to the children. The GAL opined that Mother was unsuitable, based on Mother's inability to remember her molestation accusations during the divorce, as well as the January 2021 accusation by B.H. that Mother ran over Father's foot. The GAL further relied on Mother's current estrangement from the maternal grandmother, who was the only family member who assisted Mother with the children. According to the GAL, Mother blames maternal grandmother for Mother's loss of custody of the children. Although there are other family members who live in the same vicinity, Mother testified that she does not trust them.

{¶57} The GAL conceded that Mother's home provides the most socially advantageous setting, as she lives in the city among other families with children. Grandmother and Father's residences are in less-populated rural areas. However, the GAL opined that Mother has a demonstrated history of thwarting Father's visitation rights, which the GAL believed would continue if she was the residential parent. He opined that Grandmother and Father were more likely to respect the visitation schedule.

{¶58} The Magistrate rejected the GAL's recommendation based on the Magistrate's opinion that the GAL was biased against Mother. For instance, the GAL was

Case Nos. 22 CO 0028, 22 CO 0029

troubled that Mother had a one-year-old dog that was not house-broken. The GAL opined that Mother's failure to house-break a dog for a full year was indicative of her carelessness, likening the care of a pet in some small measure to the care of a child. The Magistrate did not see a rational connection.

**{¶59}** Further, the Magistrate disagreed with the GAL's conclusions that the term "cocksucker" was an extension of Mother's previous pedophilia accusations. The Magistrate also soundly rejected the GAL's theory that Mother intentionally provoked or was in any way responsible for Father's violent outbursts. As a consequence, the Magistrate balked at the GAL's recommendation that Father, rather than Mother, should be considered the alternate residential parent should the domestic relations court decline to choose Grandmother.

**{¶60}** Applying the change of circumstances/best interest of the child test in R.C. 3109.04(E)(1)(a), the Magistrate reallocated primary residential parenting rights to Mother. Nonetheless, the Magistrate agreed with the GAL's characterization of this case as "one of the most challenging domestic relations parenting cases." (7/1/2021 Mag. Decision, p. 7.)

**{¶61}** The domestic relations court observed that Grandmother "voluntarily relinquished custody of the children," and "[t]hat act resets the table" with respect to the reallocation of parental rights. Therefore, rather than applying the R.C. 3109.04(E)(1)(a) test, the domestic relations court found that Grandmother was first required to demonstrate that both parents were unsuitable in order for the domestic relations court to consider designating a non-parent as the residential parent.

**{¶62}** After considering the objections filed by Father and Grandmother, the domestic relations court agreed with the decision of the Magistrate granting Mother's motion for reallocation of parental rights. The domestic relations court opined that Grandmother had failed to meet her burden of proof with respect to Mother's unsuitability. The domestic relations court predicated its conclusion on the fact that the parents have shared custody over the past two years, and the children are "well fed, healthy, and have done well in school, receiving passing grades." (7/6/2022 J.E., p. 14.) The domestic relations court further predicated the reallocation of parental rights to Mother on the fact that the children would not have to change schools. However, the children attended an

online school the previous year, so any school they attended in the fall of 2022 would be a new school.

**{¶63}** These timely appeals followed.

### [GRANDMOTHER'S] ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT MISAPPLIED THE LAW AS IT RELATES TO [R.C.] 3109.04.**

**{¶64}** Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 or R.C. 2151.23. *Smith v. Boyd*, 3d Dist. Seneca No. 13-05-49, 2006-Ohio-6931, ¶ 40, citing *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, ¶ 8. Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out of "any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child * * *." R.C. 3109.04(A). Conversely, R.C. 2151.23(A)(2) vests jurisdiction for custody disputes in the juvenile court for "any child not a ward of another court of the state," which typically encompasses all custody disputes between parents and non-parents. See *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, ¶ 38 (Lundberg Stratton, J., dissenting).

**{¶65}** When jurisdiction for the custody proceeding lies with the domestic relations court, R.C. 3109.04(E)(1)(a) requires the trial court to conduct a two-part test in order to modify custody. First, the trial court must determine whether a change of circumstances has occurred for the child, the child's residential parent, or either of the parents in a shared parenting decree. Second, if the court finds a change in circumstances, it must then determine whether such a modification would be necessary to serve the best interest of the child, and it must find one of three circumstances listed in the statute to be present.

**{¶66}** R.C. 3109.04 provides, in pertinent part:

(E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the

Case Nos. 22 CO 0028, 22 CO 0029

circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

R.C. 3109.04.

{¶67} Furthermore, R.C. 3109.04(F) provides a list of non-exclusive factors for the trial court to consider in determining the best interest of the child. These factors include:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F).

{¶68} Alternatively, when jurisdiction for the custody proceedings is vested in the juvenile court pursuant to R.C. 2151.23(A)(2), the statute does not explicitly provide a test or standard by which the trial court is to determine custody. Instead, R.C. 2151.23(F)(1) states that "[t]he juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 * * * of the Revised Code." As such, any custody modification must follow the two-part test of R.C. 3109.04(E)(1)(a).

{¶69} Further, the Supreme Court of Ohio has developed an additional rule for the trial court to follow in making custody determinations under R.C. 2151.23(A)(2). The rationale for the requirement of a parental unsuitability finding for custody proceedings under R.C. 2151.23(A)(2) finds its genesis in the fact that custody proceedings arising under R.C. 3109.04 typically involve disputes resulting from divorce actions involving two parents, both of whom are usually equally qualified to raise the child. *In re Perales*, 52 Ohio St.2d 89, 96, 369 N.E.2d 1047 (1977).

{¶70} However, the Supreme Court of Ohio has extended the requirement that parental unsuitability be found when awarding custody of a child to a non-parent even

when the custody proceeding arises in the domestic relations court under R.C. 3109.04. *In re Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 24, modified, 98 Ohio St.3d 1476, 2003-Ohio-980, 784 N.E.2d 709. The reason for undertaking a parental unsuitability analysis under these circumstances is clear even though the custody proceedings arise under R.C. 3109.04. The rationale for the test, to protect the fundamental right of parents, exists because the custody proceedings are between a parent and a non-parent.

{¶71} As there is a presumption under Ohio law that either parent is suitable to care for their own child, the burden is on the non-parent to prove by a preponderance of the evidence that a parent is unsuitable before the court may determine whether it is in the best interest of the child for custody to be awarded to the nonparent. *Matter of D.M.W.*, 7th Dist. Belmont No. 20 BE 0037, 2021-Ohio-4657, ¶ 20, citing *Perales, supra,* at 97-98.

{¶72} Although the natural parents' interest in raising their children is the paramount concern in an original custody determination involving a non-parent, any subsequent action to reallocate parental rights is governed exclusively by the change of circumstances/best interest test in R.C. 3109.04(E)(1)(a). In other words, following the initial custody determination, the paramount interest shifts from the rights of the natural parents to the best interest of the children. The *Hockstok* Court opined:

> [O]ur holding in this case does not change the well-established rule, codified in R.C. 3109.04(B)(1), that after the legal custody determination is made, the best-interest-of-the-child standard should be used for any custody modification petitions filed by a natural parent. A parent should be given only one unsuitability determination, which should come at the time of the legal custody hearing. After such a determination has established, or taken away, a parent's fundamental custodial rights, the focus must shift from the rights of the parents to the rights of the child. A child's rights are effectuated through the use of the best-interest-of-the-child standard for subsequent custodial modification requests.

*Id.* at ¶ 38.

**{¶73}** Here, the Magistrate applied the R.C. 3109.04(E)(1)(a) test, but the domestic relations court held that Grandmother had to demonstrate Mother's unsuitability before Grandmother could be considered as a potential residential parent. The domestic relations court's conclusion that Grandmother's voluntary relinquishment of the children "reset the table" is directly at odds with the foregoing passage from *Hockstok, supra.*

**{¶74}** The domestic relations court cited our opinion in *In re D.D.*, 7th Dist. Carroll No. 17 CA 0914, 2017-Ohio-8392, 100 N.E.3d 141, for the proposition that a finding of unsuitability is not immutable and permanent. In *In re D.D*, we affirmed the decision of the juvenile court finding the father to be unsuitable due to the child's hatred of his father, fostered perhaps unfairly by the child's deceased mother. Custody of D.D. was awarded to the child's maternal uncle.

**{¶75}** In closing, we observed the ruling in the case "[did] not mean [the father] is foreclosed from ever obtaining custody of the child. If the counseling and extended visitation result in a stable healthy bond between the child and [the father], such bond could qualify as a change of circumstance." *Id.* at ¶ 44.

**{¶76}** In a footnote, we plainly stated that the father would not be subject to the unsuitability test in subsequent reallocation proceedings:

> In the future, Appellant will have to employ change of circumstance test to seek custody of the child. *Polhamus [v. Robinson]*, 2017-Ohio-39, 80 N.E.3d 1142, at ¶ 26 (3rd Dist.), citing *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, 866 N.E.2d 467; *Purvis v. Hazelbaker*, 181 Ohio App.3d 167, 908 N.E.2d 489, 2009-Ohio-765, ¶ 10 (4th Dist.) ("[O]nce custody has been awarded to a nonparent, the court will not apply the *Perales* unfitness standard to a later request for custody modification. Instead, custody modification in that situation is determined under the R.C. 3109.04 change in circumstances/best-interest standard."); *In re V.M.B.*, 11th Dist. No. 2012–P–0112, 2013-Ohio-4298, 2013 WL 5444998, ¶ 53 (same).

*In re D.D., supra,* n. 1.

**{¶77}** Accordingly, we find that the domestic relations court applied the wrong test to the motions to reallocate parental rights in this case. Admittedly, the domestic relations court appears to agree with the Magistrate's conclusion that it was in the best interest of the children to designate Mother as the residential parent. However, the domestic relations court opined that Grandmother had failed to demonstrate that Mother was unsuitable. As a consequence, it can be gleaned the domestic relations court believed that Grandmother was not a candidate for the designation of residential parent. The legal error is of particular concern where both the GAL and the Magistrate characterized this case as one of the most difficult cases they have ever undertaken. Therefore, we reverse and vacate the judgment entry designating Mother as residential parent and remand this matter for further proceeding consistent with this Opinion.

### [GRANDMOTHER'S] ASSIGNMENT OF ERROR NO 2

**THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### [GRANDMOTHER'S] ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER ALL OF THE EVIDENCE, CONSTRUING THE EVIDENCE UNFAIRLY IN FAVOR OF [MOTHER] AND BY NOT CONDUCTING A DE NOVO HEARING ON THE OBJECTIONS TO THE MAGISTRATE'S DECISION.**

**{¶78}** As we find that Grandmother's first assignment of error has merit, we find that her remaining assignments of error are moot.

### [FATHER'S] ASSIGNMENT OF ERROR 1

**THE TRIAL COURT ERRED BY DISREGARDING THE LAW OF THE CASE AND FAILING TO APPLY THE MANDATES OF THE APPELLATE COURT, RENDERED IN A PRIOR APPEAL IN THE SAME CASE.**

**[FATHER'S] ASSIGNMENT OF ERROR 2**

**THE TRIAL COURT ERRED BY DETERMINING THAT THERE WAS A CHANGE IN CIRCUMSTANCES, OF THE CHILDREN OR THE CHILDREN'S RESIDENTIAL PARENT, BASED SOLELY UPON THE EVIDENCE FROM THE TRIAL OF APRIL 3, 2019, DUE TO THE FACT THAT NOT ALL LITIGANTS WERE AFFORDED THE OPPORTUNITY TO PARTICIPATE IN SAID HEARING.**

**{¶79}** Father's assignments of error are related, and shall be addressed together for the purpose of judicial economy. The assignments of error challenge the domestic relations court's reliance on testimony from the April 3, 2019 hearing and the Magistrate's Decision dated May 14, 2019, which was vacated as a result of the original appeal in this case.

**{¶80}** Three witnesses testified at the April 3, 2019 hearing: Father, Mother, and Father's second ex-wife, A.H. A.H. testified that she provided false testimony at an earlier hearing due to pressure from Father and Grandmother. A.H. further testified that she had been misled by Father and Grandmother, and she believed the situation at Mother's house was much worse than at Father's house.

**{¶81}** "The law-of-the-case doctrine has long existed in Ohio jurisprudence and provides that, 'the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Manshadi v. Bleggi*, 7th Dist. Mahoning No. 20 MA 0066, 2021-Ohio-3593, ¶ 10, citing *Hopkins v. Dyer*, 104 Ohio St.3d 461, 2004-Ohio-6769, 820 N.E.2d 329, ¶ 15; *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 432 N.E.2d 410 (1984). "The purpose of the doctrine is to ensure the consistency of results in a case, to avoid endless litigation by settling issues and also to preserve the integrity of superior and inferior courts set forth in the Ohio Constitution." *Manshadi* at ¶ 10.

**{¶82}** In the first appeal, this Court held:

Because Grandmother was a party, and she was not provided notice of the hearing and the right to be heard on the third motion to reallocate parental

Case Nos. 22 CO 0028, 22 CO 0029

rights, we find that the domestic relations court abused its discretion when it overruled her motion to vacate the Magistrate's judgment entry and her request for a new hearing. Accordingly, the judgment entry of the domestic relations court overruling the second motion to intervene is reversed, and this matter is remanded for further proceedings consistent with this opinion.

*C.H. v. J.H.,* 7th Dist. Columbiana No. 19 CO 0034, 2020-Ohio-4733, ¶ 4.

**{¶83}** Despite the fact that we instructed the trial court to conduct a new hearing, due to the failure of the trial court to provide to Grandmother notice of the third motion to reallocate and the April 3, 2019 hearing, the Magistrate chose instead to rely on testimony offered at the April 3, 2019 hearing, and adopt factual findings made as a result of the April 3, 2019 hearing. The forgoing actions were directly at odds with the plain language of our remand order. Grandmother was not present at the April 3, 2019 hearing. As a consequence, Grandmother was foreclosed from cross-examining A.H., who testified that Grandmother pressured A.H. to provide false testimony at the prior hearing and misled her regarding Mother's relationship with the children. Of equal import, the trial court's conclusion with respect to the change of circumstances was predicated exclusively upon testimony offered at the April 3, 2019 hearing.

**{¶84}** Accordingly, we find that the trial court violated the law of the case, as well as violated Grandmother's right to due process in denying her the opportunity to cross-examine A.H., when it considered the testimony offered at the April 3, 2019 hearing. Therefore, we find that Father's assignments of error have merit, and we remand this matter with instructions to the trial court to conduct a de novo hearing on the third motion to reallocate, where the trial court shall not consider any testimony or evidence offered at any prior hearing.

## **CONCLUSION**

**{¶85}** Because the domestic relations court predicated reallocation on Grandmother's failure to demonstrate Mother's unsuitability, rather than solely on the change of circumstances/best interest of the child test set forth in R.C. 3109.04(E)(1)(a), the judgment entry of the domestic relations court is reversed and vacated. This matter

is remanded to the domestic relations court for a de novo hearing on the third motion to reallocate, where the trial court shall not consider any testimony or evidence offered at any prior hearing.


Waite, J., concurs.

Robb, J., concurs.

[Cite as *Hunter v. Hunter*, 2023-Ohio-3331.]

---

For the reasons stated in the Opinion rendered herein, the judgment entry of the Court of Common Pleas, Domestic Relations Division, of Columbiana County, Ohio, is reversed and vacated. We hereby remand this matter to the domestic relations court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**